1  KAMALA D. HARRIS
   Attorney General of California
2  MARK BRECKLER
   Chief Assistant Attorney General
3  SALLY MAGNANI
   Senior Assistant Attorney General
4  TIMOTHY R. PATTERSON
   Supervising Deputy Attorney General
5  DENNIS A. RAGEN
   Deputy Attorney General
6  State Bar No. 106468
    110 West A Street, Suite 1100
7  San Diego, CA 92101
   P.O. Box 85266
8  San Diego, CA 92186-5266
   Telephone: (619) 645-2016
9  Fax: (619) 645-2012
   E-mail: Dennis.Ragen@doj.ca.gov
10 *Attorneys for Plaintiffs*

> **FILED**
> CLERK, U.S. DISTRICT COURT
>
> JUN 27, 2014
>
> CENTRAL DISTRICT OF CALIFORNIA
> BY: _____ PMC _____ DEPUTY

**JS-6**

11        IN THE UNITED STATES DISTRICT COURT

12        FOR THE CENTRAL DISTRICT OF CALIFORNIA

13

14  |                                                      | Case No. CV14-3918-SVW(AGRx)
15  California Department of Toxic
    Substances Control; and the California
16  Toxic Substances Control Account,      | **CONSENT DECREE**
                                             **RESOLVING PLAINTIFFS' CLAIMS**
                             Plaintiffs,     **AGAINST DEFENDANTS SPACE**
17                                           **BANK LTD, ROBERT OLTMAN and**
         v.                                  **MARGARET SCHUBERT**
18

19  Space Bank LTD, a California general
    partnership; Robert L. Oltman, an
20  individual; and Margaret M. Schubert,
    an individual,
21
                              Defendants.
22

23

24

25

26

27

28



                              1          DTSC v. SPACE BANK – CONSENT DECREE

## I. INTRODUCTION

The undersigned "Plaintiffs" and "Settling Defendants," as defined in Section IV herein (collectively, the "Parties"), enter into this Consent Decree (the "Decree" or "Consent Decree") in order to resolve Settling Defendants' alleged liability in connection with the releases and threatened releases of hazardous substances at the Space Bank Mini Storage facility, also known as the former Naval Information Research Foundation Under Sea Center, located at 3202 East Foothill Boulevard in the City of Pasadena, California (the "Site"). This Consent Decree resolves the liability of Settling Defendants for the "Matters Addressed" in this Consent Decree as defined in Section X.A. of this Decree.

## II. BASIS FOR ENTRY OF THIS DECREE

This Consent Decree is entered into by the California Department of Toxic Substances Control pursuant to its authority under Sections 107 and 113 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., as amended by the Superfund Amendments and Reauthorization Act of 1986, Pub.L.No. 99-499, 100 Stat. 1613 (1986), 42 U.S.C. §§ 9607 and 9613. Pursuant to the aforementioned authority and pursuant to CERCLA § 113(f)(2), 42 U.S.C. § 9613(f)(2), the undersigned signatories to this Decree each have stipulated and agreed to the making and entry of this Consent Decree in settlement of the claims raised in the complaint (Section V).

Plaintiffs and Settling Defendants agree, and this Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and that settlement of this matter and entry of this Consent Decree avoids expensive, prolonged and complicated litigation between the Parties, benefits the environment and the community, is the most appropriate means to resolve the matters covered herein, and is fair, reasonable and in the public interest.

/ / /

/ / /

**NOW THEREFORE, it is ORDERED, ADJUDGED, and DECREED, as follows:**

## III. JURISDICTION

The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and CERCLA, and supplemental jurisdiction over claims arising under the laws of the State of California pursuant to 28 U.S.C. § 1367(a).  Solely for purposes of this Consent Decree, Settling Defendants waive: (i) service of summons; and (ii) all objections and defenses they may have to the jurisdiction of the Court, venue in this district, or Plaintiffs' rights to enforce this Consent Decree. Settling Defendants agree not to challenge or object to entry of this Decree by the Court unless Plaintiffs have notified them in writing that Plaintiffs no longer support entry of the Decree or that Plaintiffs seek to modify the Decree.  The undersigned Parties to this Decree agree not to challenge this Court's jurisdiction to enforce the terms of this Decree once it has been entered, and this Court maintains jurisdiction over this Decree for that purpose.

## IV. PARTIES

The "Parties" to this Consent Decree are as follows:

### A.   The Plaintiffs

The "Plaintiffs" are:

1.    The California Department of Toxic Substances Control (the "Department" or "DTSC") and the California Toxic Substances Control Account, to the extent that funds from that account, or predecessors to that account, have been, or will be, expended on behalf of the Department.  The Toxic Substances Control Account is successor in interest to the following accounts:

        a.    The California Hazardous Substance Account;

        b.    The California Hazardous Waste Control Account; and

        c.    The California Site Remediation Account.

///

DTSC v. Space Bank – Consent Decree

**B.     The Settling Defendants**

The "Settling Defendants" are:

1.     Space Bank LTD, a California general partnership;

2.     Robert L. Oltman, an individual and general partner of Space Bank LTD, a California general partnership; and

3.     Margaret M. Schubert, an individual and general partner of Space Bank LTD, a California general partnership.

## V.   THE COMPLAINT

Concurrent with the lodging of this Consent Decree, Plaintiffs are filing a complaint pursuant to CERCLA and providing Settling Defendants with a copy of that complaint.  In the complaint, Plaintiffs assert that Settling Defendants are liable under CERCLA for costs that Plaintiffs have incurred or will incur in response to releases and threatened releases of hazardous substances at the Site.  Subject to the covenants, conditions, and reservations of rights in this Consent Decree, this Consent Decree resolves the claims asserted in the complaint.

## VI.  DEFINITIONS

Unless otherwise expressly provided herein, terms used in this Consent Decree that are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them therein.  Whenever terms listed below are used in this Consent Decree or in any attachments or exhibits hereto, the following definitions shall apply:

1.  "Consent Decree" or "Decree" shall mean this Consent Decree.

2.  "HSAA" shall mean the Carpenter-Presley-Tanner Hazardous Substance Account Act, California Health & Safety Code § 25300 et seq.

3.  "California Hazardous Waste Control Law" shall mean California Health & Safety Code § 25100 et seq.

4.  "Parties" shall mean Plaintiffs and Settling Defendants, and each of them.

5.  "Response Costs" shall mean the costs associated with any removal,

1   remedy or remedial action taken with respect to the Site, including, without
2   limitation: (i) enforcement activities related thereto; (ii) contractor costs; and (iii)
3   oversight costs.

4       6.   "Site" shall mean the Space Bank Mini Storage facility located at 3202
5   East Foothill Boulevard in the City of Pasadena, California.  A legal description of
6   the property comprising that facility is attached hereto as Exhibit A.

## VII. NO ADMISSIONS

8       Settling Defendants do not admit any allegations, findings, determinations or
9   conclusions contained in the complaint or this Consent Decree.  Settling
10  Defendants' entry into this Consent Decree and compliance with its terms shall not
11  be construed as an admission of liability with respect to the Site.  Nothing in this
12  Consent Decree shall be construed as an admission by any Settling Defendant of
13  any issue of law or fact.  Except as specifically provided for herein, nothing in this
14  Consent Decree shall prejudice, waive, or impair any right, remedy, or defense that
15  Settling Defendants may have against any entity.

## VIII. SITE BACKGROUND

17      The following is a summary of the Site background as alleged by the
18  Department, which, for the purposes of this Decree, Settling Defendants neither
19  admit nor deny.  The allegations that DTSC sets forth in this summary shall not
20  become findings of the Court and shall not be binding on any party or non-party in
21  any pending or future litigation:

22      A.   The Site consists of a roughly rectangular-shaped parcel of land of
23  approximately 9.33 acres developed with 27 buildings and structures.

24      B.   The U.S. Department of the Navy (the "Navy") reportedly constructed
25  the majority of the buildings located on the Site between 1945 and 1954, with the
26  exception of Building 30, which was constructed by the Navy in the 1970s.  Prior to
27  development of the Site with the current buildings, the Site was developed by C.
28  Temple Murphy Furniture Company, followed by the establishment of the Hamlin

1    and Hood Stoneworks, a plaster casting and stoneworks business, in 1930.  In the

2    early-1940's, these properties were acquired by Latisteel Corporation of California,

3    a manufacturer of steel framing, and the California Wirebound Box Company.

4    From 1943 to 1945, the Site was leased to and developed by the California Institute

5    of Technology for its torpedo program.  From the late-1940's until about 1974, the

6    Navy used the Site primarily for weapons research and development, focusing on

7    propulsion and guidance systems for underwater ordnance.

8        C.    In 1974, the Navy reportedly declared the Site excess.  In 1978, the U.S.

9    General Services Administration sold the Site to Space Bank LTD, a California

10   general partnership ("Space Bank").  Space Bank has operated the Site since 1979

11   as a self-storage facility with some space allocated to small commercial workshops,

12   which have included operations such as wood working, metal working, stone

13   cutting, auto restoration, and paper recycling.  Space Bank is a general partnership

14   between Mr. Robert Oltman and Ms. Margaret Schubert.

15       D.    In 1991, an inspection by the State of California Department of Health

16   Services identified 37 transformers on the Site that had been present since

17   occupation by the Navy.  Laboratory testing of fluids identified 19 transformers that

18   contained polychlorinated biphenyl ("PCB") concentrations of 5 parts per million

19   ("ppm") or greater, and were therefore subject to removal or retrofitting.  Of these

20   19 transformers, Space Bank had ten transformers removed and had the remaining

21   nine transformers retrofitted at Space Bank's sole cost and expense.

22       E.    In June 1998, a 2,000-gallon gasoline underground storage tank ("UST")

23   and two 200-gallon diesel USTs were removed by Maness Corporation for the U.S.

24   Army Corps of Engineers (the "ACOE").  In August 1998, the ACOE conducted

25   limited surface and subsurface soil sampling at the Site near features installed by

26   the Navy associated with storm water collection, including catch basins, inlets and

27   seepage pits.  Science Applications International Corporation conducted a follow up

28   investigation for the ACOE in November 2001.  As a result of these investigations,

1   various metals and both volatile and semi-volatile organic compounds were
2   detected in soil and sediments at these portions of the Site.
3       F.   On December 2, 2004, DTSC issued an Imminent and Substantial
4   Endangerment Determination and Remedial Action Order ("Order") to the Navy,
5   the ACOE, and Space Bank.  According to the Order, a release or a threatened
6   release of hazardous substances has occurred on the Site that may be an imminent
7   and substantial endangerment to the public health or to the environment.  On
8   November 13, 2006, DTSC revoked the Order and entered into a formal dispute
9   resolution ("DR") process with the ACOE.  Since no resolution was reached at the
10  first level of the DR process, on May 18, 2010, DTSC issued a letter to the ACOE
11  stating the necessity for proceeding to the second level of the DR process.
12  However, by December 2010, DTSC determined it was unproductive to continue
13  the DR process and decided to resume its prior path of taking an enforcement
14  action.  In a letter dated March 16, 2011, DTSC formally notified the ACOE and
15  confirmed that DTSC had terminated the DR process via email on December 13,
16  2010.  DTSC's decision was based on the fact that the process had been ongoing for
17  several years and it did not appear there had been any change in the positions taken
18  by DTSC or the ACOE during that time.
19      G.   In 2005, Kaiser Foundation Health Plan, Inc. ("Kaiser") expressed
20  interest in purchasing the Site to demolish the existing structures, and construct a
21  new medical office building on the Site.  A subsurface soil investigation was
22  conducted by SECOR International, Inc. ("SECOR") on behalf of Kaiser in
23  December 2005.  Results of this investigation showed the presence of volatile
24  organic compounds ("VOCs") including acetone, xylenes, methylene chloride,
25  toluene, and tetrachloroethylene ("PCE") ranging from 6.3 micrograms per
26  kilogram ("$\mu$g/kg") to 180 $\mu$g/kg; TPH (carbon chain >C17) from 12 to 1100
27  milligrams per kilogram; and various metals.
28  ///

DTSC v. Space Bank – Consent Decree

1    H.    In April 2006, an investigation of the vertical and lateral extent of

2    existing impacts to soil in the vicinity of the former Navy flammable/hazardous

3    storage building (Building 131) was conducted on behalf of the ACOE by

4    Innovative Technical Solutions, Inc.  In this investigation, soil samples were

5    collected from three boring locations in the vicinity of Building 131.  PCE was

6    present in all three borings to a depth of 45 feet below grade at concentrations

7    ranging from 7.1 to 44 µg/kg.

8    I.    In March 2007, Kennedy/Jenks Consultants ("Kennedy/Jenks"), on

9    behalf of Space Bank, conducted a Site-wide, screening-level shallow soil vapor

10   survey.  Results of this survey indicated an area-wide presence of VOCs

11   (predominantly PCE, carbon tetrachloride, and Freon 113) at levels ranging from

12   0.1 to 23 micrograms per liter at the sample depth of 5 feet.

13   J.    In May 2007, Kennedy/Jenks produced a document that summarized the

14   Site's known environmental history.  Prior to this report, the Site's history had been

15   described in numerous prior reports and a significant volume of data had been

16   obtained and presented.  The document produced for Space Bank by

17   Kennedy/Jenks organized this data and historical material into a single report.

18   K.    In September 2007, Space Bank and Pasadena Gateway, LLC ("Pasadena

19   Gateway") entered into a purchase and sales agreement for the Site.  As part of the

20   purchase and sales agreement, Pasadena Gateway agreed to perform additional

21   response actions under the oversight of DTSC pursuant to the terms and conditions

22   of an Agreement Not To Sue (i.e., Prospective Purchaser Agreement) entered into

23   between Pasadena Gateway, DTSC, and the California Regional Water Control

24   Board, Los Angeles Region (RWQCB-LA).  These additional response actions

25   include a further characterization of soils and a preliminary groundwater

26   investigation at the Site.  In November 2007, Ninyo and Moore conducted a

27   subsurface soil investigation for Pasadena Gateway.  Preliminary results of the

28   investigation showed the presence of PCE, Freon 1113, and carbon tetrachloride to

1  a depth of 150 feet in soil gas samples.  Metals, predominantly arsenic, were

2  detected down to 50 feet in soil matrix samples.

3       L.    In July 2008, Kennedy/Jenks issued a detailed tenant history of the Site

4  while under Space Bank's ownership.  As set forth in the tenant history report,

5  since the start of Space Bank's operations in 1978, there have been two primary

6  types of tenants at the Site.  The first type of tenant is an individual or business that

7  has used the Site for self-storage of household or office goods.  The second type of

8  tenant is, typically, an individual or small commercial business that has out-grown a

9  garage-sized operation and needs slightly larger accommodations.  Most of these

10  workshops are less than 1,000-square feet in size.  The report concluded that most

11  of the tenants have had little or no potential to have impacted the subsurface of the

12  Site.  Rental contracts have always prohibited the storage of flammable, explosive,

13  or inherently dangerous materials and any tenants wanting to store, use, or dispose

14  of large quantities of hazardous materials have never been permitted to rent at

15  Space Bank.  However, certain tenants may have used products or ingredients that

16  contained hazardous substances, and one tenant stored certain hazardous materials

17  in violation of the applicable rental agreement.  According to Space Bank

18  personnel, no reportable spills or fires have occurred during Space Bank's

19  ownership.

20  **IX.  OBLIGATIONS OF SETTLING DEFENDANTS**

21      In cooperation with DTSC, Settling Defendants have proactively engaged in

22  extensive Site assessment and investigation activities relating to potential hazardous

23  substances releases at the Site and Settling Defendants agree to implement and/or

24  cooperate with DTSC in implementing additional response actions as specified in

25  this Decree.

26      A.   Settling Defendants' assessment and investigation activities.  Settling

27  Defendants' assessment and investigation activities have contributed toward the

28  eventual remediation of the Site.  These activities have included the following:

1.    In 1991, an inspection by the State of California Department of Health Services identified 37 transformers on the Site that had been present since occupation by the Navy.  Laboratory testing of fluids identified 19 transformers that contained PCB concentrations of 5 ppm or greater, and therefore subject to removal or retrofitting.  Of these 19 transformers, Space Bank had ten transformers removed and had the remaining nine transformers retrofitted, at Space Bank's sole cost and expense.

2.    Settling Defendants commissioned a Phase I Environmental Assessment Report by ATC Associates, Inc. in 1999 as part of a pro-active approach towards understanding the potential environmental risks at the Site.

3.    Settling Defendants' consultant, Kennedy/Jenks, performed a Site-wide shallow soil vapor survey in March 2007, which resulted in the first soil vapor analytical data gathered at the Site (Soil Vapor Survey Report, April 2007).  The scope of work included 56 sample locations throughout the Site.  DTSC reviewed the work plan for this work and concluded that the additional data would be helpful in the characterization of VOCs at the Site.

4.    Settling Defendants assisted DTSC in understanding the Site's history by directing Kennedy/Jenks to complete a summary report of the Site's history, including previous environmental investigations (Environmental Summary Report, May 2007).  This report added to DTSC's understanding of tenant history and soil gas characterization at the Site.

5.    At the request of DTSC, Settling Defendants and Kennedy/Jenks collaborated to compile and review information regarding the history and usage of the Site during Space Bank's ownership.  The completed study

1    provides a comprehensive examination of usage and operations at the

2    Site by Space Bank's tenants (Tenant History Report, July 2008). As

3    part of this investigation, Settling Defendants gathered and compiled

4    tenant history information for their entire ownership of the Site and

5    Kennedy/Jenks performed interviews with numerous current and prior

6    tenants of the small workshop spaces and Space Bank personnel.

7    6.    As a result of the Site-wide shallow soil vapor survey, review of

8    previous environmental reports and Space Bank records, and Site visits

9    and interviews, Settling Defendants, with the assistance of their

10   consultants at Kennedy/Jenks, have prepared the following reports:  a

11   Soil Vapor Survey Report (2007), an Environmental Summary Report

12   (2007), and a Tenant History Report (2008).

13   7.    Settling Defendants have negotiated with prospective buyers of the

14   Site to conduct further assessment and investigation on behalf of, and in

15   coordination with, Settling Defendants.  For example, when Space Bank

16   entered into negotiations with Kaiser to purchase the Site in 2005, Space

17   Bank worked in cooperation with DTSC, Kaiser, and Kaiser's consultant,

18   SECOR, to produce reports that included a Phase I Environmental

19   Assessment Report (2006), Expedited Phase 2 Environmental

20   Assessment Report (2006), Pre-Demolition Hazardous Materials

21   Assessment Report (2006), and Workplan for Additional Soil/Soil Vapor

22   Investigation (2006).  Studies and investigative activities that occurred at

23   the Site in coordination with Kaiser and SECOR were coordinated and

24   assisted by Settling Defendants over the course of approximately one

25   year.  Those investigations included 12 sample locations and collection

26   and analysis of over 70 soil samples.

27   8.    Similarly, Settling Defendants have negotiated for and cooperated

28   with Pasadena Gateway to further assess and investigate the Site as part

1    of a purchase and sales agreement entered into by the parties in

2    September 2007. The most recent soil and soil vapor data at the Site was

3    developed by Pasadena Gateway's consultant, Ninyo & Moore

4    Geotechnical and Environmental Consultants ("Ninyo & Moore"), from a

5    work plan that was reviewed and developed with Settling Defendants'

6    consultants at Kennedy/Jenks, and DTSC. Additionally, Settling

7    Defendants coordinated Site activities with Pasadena Gateway, Ninyo &

8    Moore, Kennedy/Jenks, and Space Bank's tenants, and provided

9    oversight for these activities. In total, Settling Defendants' investigation

10   and assessment activities, including those activities that have been

11   undertaken by third parties as a result of agreements reached with

12   Settling Defendants, have contributed more than 650 analytical test

13   results for samples collected throughout the Site. As a direct result of the

14   investigative work that Space Bank has undertaken or authorized,

15   DTSC's understanding of the Site has been significantly advanced.

16   Additionally, Settling Defendants have negotiated a purchase and sales

17   agreement with Pasadena Gateway, as a result of which Pasadena

18   Gateway has entered into an Agreement Not To Sue (i.e., Prospective

19   Purchaser Agreement [November 2011]) with DTSC and the RWQCB-

20   LA, pursuant to which Pasadena Gateway will undertake additional

21   response actions under the oversight of DTSC upon Pasadena Gateway's

22   acquisition of title to the Site.

23       B.    Settling Defendants' Additional Obligations. Additionally, Settling

24   Defendants shall fulfill, as necessary, the obligations set forth below:

25       1.    Settling Defendants shall provide DTSC with further cooperation

26   and such additional or supplemental information as may be obtained by

27   Settling Defendants following the Effective Date of this Decree with

28   respect to the investigation they have completed pursuant to Section IX.A

1   (Settling Defendants' assessment and investigation activities) of this

2   Decree.

3       2.    Settling Defendants shall permit DTSC and its authorized

4   representatives to inspect and copy all data and reports generated by, on

5   behalf of, or in coordination with Settling Defendants in any way

6   pertaining to the investigation and assessment of the Site. Settling

7   Defendants shall maintain and preserve all such data and reports for a

8   minimum of five (5) years after the Effective Date of this Decree, or such

9   longer time as may be requested by DTSC.

10       3.    During any period of ownership of the Site and to the extent it is

11   within the control of Settling Defendants, Settling Defendants shall

12   provide reasonable access to DTSC and all persons identified by DTSC

13   as Site potentially responsible parties ("PRPs"), if such persons have

14   been ordered by DTSC or have agreed with DTSC to perform any

15   investigatory or response actions required by DTSC at the Site. This

16   shall include any response actions undertaken by a federal entity.

17   Settling Defendants shall not unreasonably impede the performance of

18   any activities being performed by any Site PRPs that are acting in

19   compliance with an order from, or a settlement agreement with, DTSC.

20       C.    In negotiating this Decree with Settling Defendants, Plaintiffs have taken

21   into account: (1) Settling Defendants' past conduct and contributions towards the

22   investigation and assessment of the Site, as set forth above; (2) any use of

23   hazardous substances by Settling Defendants, their agents tenants and lessees, and

24   Settling Defendants' potential responsibility for hazardous substances releases at

25   the Site; (3) Settling Defendants' past and ongoing cooperation with DTSC; (4) the

26   value of Settling Defendants' investigation and assessment activities to DTSC in

27   fashioning and implementing an appropriate remedial action at the Site; and (5) the

28   additional response actions to be conducted by Pasadena Gateway in the future.

1   Based on these considerations, Plaintiffs have determined that the settlement set

2   forth in this Decree, including Settling Defendants' past contribution and future

3   obligations pursuant to this Section IX, is fair, reasonable, and consistent with the

4   provisions of CERCLA.

5   **X.   COVENANTS NOT TO SUE**

6       **A.   Plaintiffs' Covenant Not to Sue**

7       Except as specifically provided in Section XI of this Decree (Reservation of

8   Rights), Plaintiffs covenant not to sue or take any other further civil or

9   administrative action against Settling Defendants for "Matters Addressed" in this

10  Decree.

11      1. <u>Matters Addressed</u>. "Matters Addressed" shall include: (1) any and all

12      civil and/or administrative liabilities for reimbursement of any past,

13      present, or future Response Costs; and/or (2) any and all civil and/or

14      administrative liabilities and/or Response Costs as a result of or pursuant

15      to any claims for or relating to declaratory relief, civil penalties,

16      administrative penalties and/or injunctive relief, under CERCLA, the

17      HSAA, the California Hazardous Waste Control Law and/or common

18      law or statutory claims, including but not limited to nuisance, with regard

19      to releases or threatened releases of solid wastes and/or hazardous

20      substances and/or wastes, as those terms are defined pursuant to

21      CERCLA, the HSAA, the California Hazardous Waste Control Law,

22      and/or other federal or State statutes and regulations, in, at or from the

23      Site.

24      2. <u>Matters That Are Not Addressed:</u>  The Matters Addressed in this

25      Consent Decree do not include those Response Costs or response actions

26      as to which Plaintiffs have reserved their rights under Sections XI.B

27      (Claims Regarding Other Sites), XI.C (Claims Against Other Persons and

28  / / /

1   Entities) or XI.D.5 (Reservation of Claims – [disposal at locations other

2   than the Site]).

3   **B.   Limitations on Covenant Not to Sue.**

4   This Covenant Not to Sue is conditioned upon the satisfactory performance by

5   Settling Defendants of their obligations under this Consent Decree.  Except as

6   expressly provided in Section XIII.A (Parties Bound), this Covenant Not to Sue is

7   that of Plaintiffs only and does not affect the rights of any other agency of the State

8   of California.

9   Settling Defendants are not released from any matter not addressed by this

10   Consent Decree.  Settling Defendants are not released from any claims arising from

11   the rights reserved by Plaintiffs in Section XI of this Decree (Reservation of

12   Rights).

13   **C.   Settling Defendants' Covenant Not to Sue**

14   Settling Defendants hereby covenant not to sue or assert any claims, causes of

15   action or claims for reimbursement against Plaintiffs arising out of any matters

16   relating to the Site or this Consent Decree.  Settling Defendants reserve the right to

17   take action to compel Plaintiffs to comply with the terms of this Consent Decree.

18   **XI.   RESERVATION OF RIGHTS**

19   **A.   Obligations Under This Decree**

20   In the event Plaintiffs initiate any legal proceedings against Settling

21   Defendants for non-compliance with this Consent Decree, Settling Defendants shall

22   not contest their obligation to fully comply with this Decree.  However, in such

23   proceedings, Settling Defendants may raise any and all defenses that Settling

24   Defendants deem to be relevant to the issue of whether or not they have complied

25   with the terms of the Decree.  Plaintiffs reserve their rights to recover the fees and

26   costs they reasonably incur to enforce this Consent Decree, after first providing

27   Settling Defendants with written notice specifying any alleged non-compliance with

28   the terms set forth in this Decree.

**B.   Claims Regarding Other Sites**

Nothing in this Consent Decree is intended or shall be construed to limit the rights of Plaintiffs or Settling Defendants with respect to claims arising out of or relating to the deposit, release, or disposal of hazardous substances at any location other than the Site subject to this Decree.  This Section XI, however, shall not limit the covenants not to sue and releases in this Decree that apply to claims arising from the spread or passive migration of hazardous substances from the Site.

**C.   Claims Against Other Persons and Entities**

Nothing in this Consent Decree shall constitute or be construed as a release or covenant not to sue regarding any claim or cause of action against any person (as defined in CERCLA § 101(21), 42 U.S.C. § 9601(21)) or any other entity who is not a signatory to this Consent Decree, for any liability he, she or it may have arising out of or relating to the Site.  The legal and equitable rights retained include, but are not limited to: (i) the Department's right to compel any person who is not a signatory to the Decree to take response actions for hazardous substance contamination at the Site; and (ii) the rights of the Parties to seek reimbursement and/or other relief from any person who is not a signatory to this Decree for costs incurred as a result of such contamination.  Except as provided in Section XIII.A (Parties Bound), nothing in this Consent Decree shall be construed to create any rights in, or grant any cause of action to, any person not a party to this Consent Decree.

**D.   Reservation of Claims**

Plaintiffs' Covenants Not to Sue (Section X) above, do not pertain to, and Plaintiffs reserve the right to bring claims against Settling Defendants arising from, the following matters:

1.   Failure of Settling Defendants to meet the requirements of this Consent Decree;

/ / /

2.     Damage to natural resources, as defined in Section 101(6) of CERCLA, 42 U.S.C. § 9601(6), including all costs incurred by any natural resources trustees;

3.     Introduction, by Settling Defendants, or Settling Defendants' agents, tenants or lessees, of any hazardous substance, pollutant, or contaminant to the Site in the future;

4.     Future overt act(s) by Settling Defendants, or Settling Defendants' agents, tenants or lessees, that cause(s) the exacerbation of the hazardous substance conditions existing at the Site;

5.     Claims based on liability arising from the past, present, or future disposal of hazardous substances at sites or locations other than the Site. This subsection 5, however, shall not limit the covenants not to sue in this Decree that apply to claims arising from the passive migration of hazardous substances from the Site; and

6.     Claims based on criminal liability; at present, however, Plaintiffs have no pending criminal claim or investigation, nor are they aware of any facts that would give rise to a criminal investigation, against any Settling Defendant.

**E.  Other Rights Reserved**

Except as expressly provided in the Consent Decree, nothing in the Consent Decree is intended nor shall it be construed to preclude the Department from exercising its authority under any law, statute or regulation. Furthermore, nothing in the Consent Decree is intended, nor shall it be construed, to preclude any other state agency, department, board or entity or any federal entity from exercising its authority under any law, statute or regulation.

**F.  Plaintiffs' Further Reservation**

Notwithstanding any other provision of this Consent Decree, Plaintiffs reserve the right to institute proceedings in this action or in a new action seeking to compel

DTSC v. SPACE BANK – CONSENT DECREE

1   Settling Defendants to perform additional response work to address the releases of

2   hazardous substances at or from the Site and/or seeking reimbursement of the

3   Department's Response Costs, if new information is discovered that indicates that

4   Settling Defendants, or their agents, tenants or lessees, contributed hazardous

5   substances to the Site in such greater amount or of such greater toxic or other

6   hazardous effects that Settling Defendants no longer qualify for protection under

7   the Covenants Not to Sue, because Settling Defendants (a) contributed greater than

8   one percent (1%) of the hazardous substances at the Site or (b) contributed

9   hazardous substances that are significantly more toxic or are of significantly greater

10  hazardous effect than other hazardous substances at the Site.

11  **G.  Other Rights Reserved by All Parties**

12  Except as otherwise provided in this Decree, the Parties expressly reserve all

13  rights and defenses that they may have.

14  **XII. CONTRIBUTION PROTECTION**

15  With regard to claims for contribution against Settling Defendants, the Parties

16  agree, and the Court finds as follows:

17  A.  This Consent Decree constitutes a judicially approved settlement within

18  the meaning of CERCLA §113(f)(2), 42 U.S.C. § 9613(f)(2), for Matters

19  Addressed in this Consent Decree.

20  B.  Settling Defendants have resolved their liability for: (a) Response Costs

21  incurred by or on behalf of the Department with respect to the Site; (b)

22  past, present and future Response Costs that have been or may be

23  incurred with respect to the Site by: (i) any past, present or future owner

24  or operator of the Site; or (ii) any party, person or entity who has sought

25  or may seek contribution or indemnity under CERCLA or any other state

26  or federal law; (c) the work to be performed by Settling Defendants

27  described herein, to the extent that such work is actually performed by or

28  on behalf of Settling Defendants and approved by DTSC; (d) past,

1   present and future DTSC oversight costs; and (e) interest on amounts

2   referred to in subsections (b) through (d), above.

3   C.   Nothing in this Section XII (Contribution Protection) shall limit the rights

4   of the Parties against any third person or entity that is not a party to this

5   Decree, including, without limitation, the Department's right to enforce a

6   cleanup of the Site and to recover any Response Costs associated with

7   that cleanup.

8   D.   Except as provided in Section XIII.A (Parties Bound), nothing in this

9   Consent Decree shall be construed to create any rights in, or grant any

10   cause of action to, any person not a party to this Consent Decree with

11   respect to the Site.  Each of the Parties to this Consent Decree expressly

12   reserves, and this Consent Decree is without prejudice to, all rights

13   (including, but not limited to, any right to contribution, indemnification

14   and/or reimbursement), defenses, claims, remedies, demands, and causes

15   of action that each party may have with respect to any matter, transaction,

16   or occurrence relating in any way to the Site against any person not a

17   party hereto.

18   E.   In the event that any Settling Defendant fails to comply with this Consent

19   Decree, such failure shall not lessen the contribution protection provided

20   by this Section XII, but Plaintiffs retain their rights to enforce the terms

21   of this Consent Decree, including the rights specified in Sections XI.A

22   (Obligations Under this Decree) and XI.D.1 (Reservation of Claims

23   [failure to meet the requirements of this Decree]), above, of this Consent

24   Decree.  As specified in Section XVI (Retention of Jurisdiction), below,

25   this Court retains jurisdiction to enforce the terms of this Decree.

26   F.   In the event that any Plaintiff asserts claims against Settling Defendants

27   coming within the scope of Sections XI.D.2 (Reservation of Claims

28   [Damages to Natural Resources]), XI.D.3 (Reservation of Claims

1        [introduction of contaminants in the future]), XI.D.4 (Reservation of

2        Claims [future acts that exacerbate conditions]), XI.D.6 (Reservation of

3        Claims [Criminal Liability]), XI.E (Other Rights Reserved) or XI.F

4        (Plaintiffs' Further Reservation), then the Contribution Protection

5        provided by this Section XII shall not include the subject matter of any

6        such claim(s) that Plaintiff(s) assert.

7     G.    In the event that the contribution protection afforded by this Section XII

8        is challenged in a judicial or administrative action, the Department agrees

9        to provide briefing and argument in support of DTSC's understanding of

10       Settling Defendants' entitlement to the contribution protection that is

11       provided by this section.

12  **XIII.    GENERAL PROVISIONS**

13     **A.   Parties Bound**

14       This Decree applies to and is binding upon the Parties and each of them, and

15  each of their trustees, corporate predecessors, administrators, successors and

16  assignees.  This Decree shall be binding upon, and inure to the benefit of, the

17  Department and any successor agencies of the State of California, including any

18  agencies that succeed to (1) DTSC's authority pursuant to the HSAA; and (2)

19  DTSC's authority as lead agency of the State of California with respect to the Site.

20     **B.   Additional Actions**

21       By entering into this Decree, the Department does not waive the right to take

22  any further actions authorized by law, except as expressly provided herein.

23     **C.   No Waiver of Enforcement**

24       The failure of the Department to enforce any provision of this Consent Decree

25  shall in no way be deemed a waiver of such provision, or in any way affect the

26  validity of this Decree.  The failure of the Department to enforce any such provision

27  shall not preclude it from later enforcing the same or any other provision of this

28  Consent Decree.

**D.   No Findings**

The statements of fact set forth in this Decree are not intended to constitute a finding by DTSC as to the risks to human health or the environment that may be posed by contamination at the Site.  This Decree does not constitute a representation by DTSC that the Site, or any part thereof, is fit for any particular purpose.

**E.   Governmental Liability**

Nothing herein is intended, nor shall be construed, to limit, impair, or prejudice the governmental tort, statutory or sovereign immunities available to DTSC under applicable law for its oversight or other activities with respect to the Site.

**F.   Modification**

This Consent Decree may be modified upon written approval of the Parties hereto and with the consent of the court.

**G.   Recording**

After this Decree has been entered by the Court, Plaintiffs shall record a copy of this Decree, including the Exhibit hereto, with the Los Angeles County Recorder with respect to the Site, solely for the purpose of informing future purchasers of the Site, or of any portion of the Site, of the contribution protection and covenants not to sue that are provided by this Decree.  The Parties shall cooperate and provide assistance in taking the steps necessary to achieve the recording of this Decree.

**H.   Integration**

This Consent Decree constitutes the entire agreement between the Parties and may not be amended or supplemented except as provided for in the Consent Decree.

**I.   Attorneys' Fees and Costs**

Each party to this Consent Decree shall bear its own costs, attorneys' fees, expert witness fees and all other costs of litigation, with the following exception:

1  Settling Defendants agree to reimburse DTSC for all of its costs, if not otherwise
2  recovered, and the reasonable fees and costs that the Attorney General bills to
3  DTSC with respect (1) to the negotiation, approval and entry of this Decree, and (2)
4  activities performed pursuant to Section XIII.G. (Recording), above  This
5  paragraph shall have no effect on the rights of the Department or Settling
6  Defendants to recover such fees or costs from any other party.
7      **J.   Counterparts**
8      This Consent Decree may be executed in two or more counterparts, each of
9  which shall be deemed an original, but all of which together shall constitute one and
10  the same instrument.
11     **K.   Applicable Law**
12     This Decree is entered into and shall be construed and interpreted in
13  accordance with the laws of the State of California and, where applicable, the laws
14  of the United States.
15     **L.   Notice**
16     Notification to or communication among the Parties as required or provided
17  for in this Consent Decree shall be addressed as follows:
18     For Plaintiffs:
19     Jennifer Rich, Project Manager
       California Department of Toxic Substances Control
20     5796 Corporate Avenue
       Cypress, CA  90630
21
22     - and -
23     Vivian Murai, Senior Attorney
       California Department of Toxic Substances Control
24     1001 "I" Street, MS-23A
       P.O. Box 806
25     Sacramento CA  95812-0806
26     For Settling Defendants:
27     Gary Meyer, Esq.
       Parker, Milliken, Clark, O'Hara & Samuelian, PC
28     555 South Flower Street, 30th Floor
       Los Angeles, CA  90071

22       DTSC V. SPACE BANK – CONSENT DECREE

1  **XIV.   PUBLIC COMMENT**

2  This Consent Decree shall be subject to a public comment period of not less

3  than thirty (30) calendar days.  DTSC may modify or withdraw its consent to this

4  Consent Decree if comments received disclose facts or considerations that indicate

5  that this Consent Decree is inappropriate, improper or inadequate.

6  **XV.   NOTICE TO THE UNITED STATES AND U.S. EPA**

7  The Department will provide the Attorney General of the United States and

8  the United States Environmental Protection Agency ("U.S. EPA") with copies of

9  the complaint filed in the present action.  Within ten (10) business days after the

10  day that this Decree is signed by all the Parties, the Department will serve copies of

11  this Decree on the Project Officer for California at the offices of U.S. EPA, Region

12  IX.  DTSC will also provide the Project Officer for California with notice of the

13  opportunity for public comments, as set forth in Section XIV (Public Comment).

14  **XVI.   RETENTION OF JURISDICTION**

15  Notwithstanding any dismissal of this action or of any of the claims filed in

16  this action, the Court retains jurisdiction to enforce the terms of this Decree and to

17  resolve any disputes arising under this Decree.

18  **XVII.   EFFECTIVE DATE**

19  The Effective Date of this Decree is the date that this Court enters an Order

20  approving this Decree.

21  **XVIII.   TERMINATION OF CONSENT DECREE**

22  A.   This Consent Decree, including the Covenant Not to Sue (Section X) and

23  Contribution Protection (Section XII) provided herein, is expressly contingent upon

24  the consummation of the sale of the Site by Settling Defendants to Pasadena

25  Gateway and the transfer of title to the Site from Settling Defendants to Pasadena

26  Gateway.  Unless otherwise agreed to by the Parties pursuant to this Section XVIII,

27  if, for any reason, the purchase and sale of the Site is not consummated and title is

28  not transferred from Settling Defendants to Pasadena Gateway on or before January

1   30, 2016, then this Consent Decree, including the Covenant Not to Sue (Section X)

2   and Contribution Protection (Section XII), may be terminated by Plaintiffs, as

3   follows:

4        1.    Termination will take effect and the "Termination Date" will be ninety

5              (90) calendar days after Plaintiffs file with the Court and serve on

6              Settling Defendants a written Notice of Termination of Consent Decree.

7      **B.**    Should Settling Defendants and Pasadena Gateway agree to extend their

8   closing date beyond January 30, 2016, then this Consent Decree shall continue to

9   be deemed valid and operative and not be deemed terminated during the pendency

10  of the extended closing date, subject to the following conditions:

11       1.    Settling Defendants shall provide written notice of the extended closing

12             date to DTSC prior to the original January 30, 2016 closing date or

13             within thirty (30) calendar days of the date on which Settling Defendants

14             and Pasadena Gateway agree to the extended closing date, whichever

15             date is earliest;

16       2.    DTSC agrees that it shall not object to the extension agreement unless it

17             reasonably contemplates that the new extended closing date or related

18             factors may result in material prejudice to DTSC or to its efforts to

19             remediate the Site.  In such case, DTSC shall provide Settling Defendants

20             with written notice of its objection within thirty (30) business days of its

21             receipt of notice from Settling Defendants regarding its agreement with

22             Pasadena Gateway to extend the original closing date.  Thereafter, the

23             Parties shall have sixty (60) calendar days from the date of DTSC's

24             written notice to meet and confer and attempt to resolve any material

25             prejudice concerns about which DTSC has notified Settling Defendants.

26             The Consent Decree shall continue to be operative and not deemed

27             terminated during this sixty (60) calendar day meet and confer period.  If

28

1       the Parties are unable to resolve DTSC's concerns, then DTSC may

2       terminate the Consent Decree in accordance with Section XVIII.A.1.

3    3.   Should DTSC fail to provide written notice within the thirty (30)

4       business day time period prescribed in Section XVIII.B.2., above, then

5       the Consent Decree shall continue to be valid and operative and not

6       deemed terminated during the pendency of the extended closing date.

7    4.   Should Settling Defendants and Pasadena Gateway agree to a further

8       extension of the extended closing date, then Settling Defendants must

9       notify Plaintiffs of the further extended closing date in accordance with,

10      and the Parties must follow, the procedures outlined in this Section

11      XVIII.B.

12    **C.**   Notwithstanding and separate from the provisions of Section XVIII.B.,

13  above, Settling Defendants may seek an extension of the Termination Date by

14  making a written request to DTSC ("Extension Request"), which Extension Request

15  must be received by DTSC prior to the Termination Date, and in which Settling

16  Defendants represent that:

17    1.   Settling Defendants are making a diligent effort to market the Site so as

18      to transfer title to the Site to another entity that will enter into an

19      Agreement with DTSC and the RWQCB-LA (i.e., Prospective Purchaser

20      Agreement, or "PPA"), which PPA will contain the same or materially

21      similar response action terms as are contained in the Agreement Not to

22      Sue executed between Pasadena Gateway, DTSC, and the RWQCB-LA,

23      as may be negotiated by and between DTSC, the RWQCB-LA, and

24      Settling Defendants' prospective new buyer.  DTSC, however, reserves

25      the right to alter or update these terms as reasonably necessary to reflect

26      the Site conditions and/or legal requirements that exist at the time of the

27      execution of the new PPA; and

28

2.    The requested extension and the terms and conditions contained in a new PPA, as referenced above, will not result in any material prejudice to DTSC or its efforts to remediate the Site.

DTSC shall not unreasonably deny Settling Defendants' Extension Request.

If the Site is not sold, within the DTSC-approved extension period, to a purchaser who has executed a PPA with DTSC and the RWQCB-LA, then DTSC may terminate this Consent Decree. DTSC will proceed with this termination in accordance with the procedure outlined in Section XVIII.A.1.

**D.**    Notice of Extended Closing Date. Settling Defendants shall file and serve a notice informing the Court of any extended closing date that becomes effective pursuant to Sections XVIII.B or C. above.

**E.**    Plaintiffs' Additional Rights on Termination. In the event this Decree is terminated, then Plaintiffs may pursue their Site-related claims against Settling Defendants by (a) proceeding in this action or (b) commencing a new action or asserting claims in a separate action, and Settling Defendants agree as follows:

1.    Tolling. If Plaintiffs commence a separate action in pursuit of their Site-related claims against Settling Defendants, then any and all applicable statutes of limitation, the equitable defense of laches, and all other defenses concerning the timeliness of commencing a civil action shall be tolled from the date of the filing of the Complaint in this action to the Termination Date (including any extension of the Termination Date).

2.    Waiver of Claim Splitting Defense. If Plaintiffs commence a separate action in pursuance of their Site-related claims against Settling Defendants, then Settling Defendants waive, and agree not to assert in such separate action, any defense of res judicata, estoppel, or claim splitting based on their entry into this Consent Decree or the filing of the Complaint in this action.

    DTSC v. SPACE BANK – CONSENT DECREE

3.   <u>Waiver of Laches</u>.  If Plaintiffs proceed in this action or commence a new action or assert claims in a separate action against Settling Defendants, then Settling Defendants waive the equitable defense of laches based on the period from the filing of the Complaint to the Termination Date (including any extension of the Termination Date).

**F.   Stay of Legal Action Following the Termination Date.**

In the event that this Consent Decree is terminated, then commencing with the Termination Date and for 120 calendar days thereafter, Plaintiffs will refrain from taking the following actions regarding conditions now known or suspected to be present at the Site:

1.   Any substantive action in the present case; or

2.   The commencement of a new action or the assertion of any claims in a separate action against Settling Defendants, except an action to address an imminent and/or substantial endangerment to the public health or welfare or to the environment.

The tolling described in Section XVIII.E.1, above, shall remain in effect during the 120 day duration of this stay of legal action.

Plaintiffs will provide Settling Defendants with thirty (30) calendar days' written notice of their election to pursue or commence an action against Settling Defendants as specified in subsections (1) and (2) above, but Plaintiffs need not provide such notice if the action is taken to address an imminent and/or substantial endangerment to the public health or welfare or to the environment.

///
///
///
///
///
///

XIX.     **SIGNATORIES**

Each signatory to this Consent Decree certifies that he or she is fully authorized by the party he or she represents to enter into the terms and conditions of this Consent Decree, to execute it on behalf of the party represented, and to legally bind that party to all the terms and conditions of this Decree.


SO ORDERED, SIGNED and ENTERED THIS 27th DAY OF June, ~~2014~~ 2014.

By: _____
United States District Judge